UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF WASHINGTON
AT TACOMA

| | |
|---|---|
| WILLIAM DUTCHER,<br><br>               Plaintiff,<br><br>      v.<br><br>JOSEPH LEHMAN,<br><br>               Defendant, | Case No.  C04-5506RBL<br><br>REPORT AND RECOMMENDATION<br><br>Noted for October 28, 2005 |

      This 42 U.S.C. § 1983 civil rights action has been referred to the undersigned Magistrate Judge pursuant to Title 28 U.S.C. §§ 636(b)(1)(A) and 636(b)(1)(B) and Local Magistrates' Rules MJR 1, MJR 3, and MJR 4.  Before the court is defendant's motion for summary judgment (Dkt. # 34) and plaintiff's motion for partial summary judgment (Dkt. #35).  Defendant argues that there is no liberty interest in release to community custody for a person under a sentence structure like plaintiff's and that he is entitled to qualified immunity from damages at the very least.

      At issue in this case is whether it was clearly established under the Due Process Clause of the Fourteenth Amendment to the United States Constitution that inmates are entitled to due process before a release plan is denied, when the inmate is held beyond their earned early release date and the inmate is subject

REPORT AND RECOMMENDATION
Page - 1

to community custody or community placement. Each party has filed responses and replies to the other party's summary judgment motion. Although plaintiff has requested it, the undersigned finds that oral argument is not necessary. Accordingly, this matter is now ripe for review.

## FACTS

Washington state has implemented an extremely complex sentencing system. Under this system some inmates may earn time off their sentence by programing and good behavior while incarcerated. Other inmates, such as plaintiff, may not earn time off their sentences. Instead, those inmates may become eligible for placement in the community under supervision in lieu of earning good time or earned time.

Plaintiff was convicted of communication with a minor for immoral purposes in 1998, and sentenced in 1999. At the time he was sentenced, plaintiff was given a term of community placement which was to be served at the end of his sentence in lieu of good time or earned time. (Dkt. # 34, Exhibit 1, Attachment A, p. 3). RCW 9.94A.728 (2) provides:

> No person serving a sentence imposed pursuant to this chapter and committed to the custody of the department shall leave the confines of the correctional facility or be released prior to the expiration of the sentence except as follows:
> ...
>
> (2)(a) A person convicted of a sex offense or an offense categorized as a serious violent offense, assault in the second degree, vehicular homicide, vehicular assault, assault of a child in the second degree, any crime against persons where it is determined in accordance with RCW 9.94A.602 that the offender or an accomplice was armed with a deadly weapon at the time of commission, or any felony offense under chapter 69.50 or 69.52 RCW, **committed before July 1, 2000, may become eligible, in accordance with a program developed by the department, for transfer to community custody status in lieu of earned release time pursuant to subsection (1) of this section;**
>
> (b) A person convicted of a sex offense, a violent offense, any crime against persons under RCW 9.94A.411(2), or a felony offense under chapter 69.50 or 69.52 RCW, committed on or after July 1, 2000, may become eligible, in accordance with a program developed by the department, for transfer to community custody status in lieu of earned release time pursuant to subsection (1) of this section;
>
> (c) The department shall, as a part of its program for release to the community in lieu of earned release, require the offender to propose a release plan that includes an approved residence and living arrangement. All offenders with community placement or community custody terms eligible for release to community custody status in lieu of earned release shall provide an approved residence and living arrangement prior to release to the community;
>
> (d) The department may deny transfer to community custody status in lieu of earned release time pursuant to subsection (1) of this section if the department determines an offender's release plan, including proposed residence location and living arrangements, may violate the conditions of the sentence or conditions of supervision, place the offender at risk to violate the conditions of the sentence, place the offender at risk to reoffend, or present a risk to victim safety or community safety. The department's authority under this section is independent of any

REPORT AND RECOMMENDATION
Page - 2

> court-ordered condition of sentence or statutory provision regarding conditions for community custody or community placement;
>
> ....

Plaintiff had an earned early release date ("EERD") of January 24, 2002, and a maximum release date of September 14, 2003. (Dkt. #34, Exhibit 2, Attachment A, p. 1). In early January 2002, plaintiff authorized the Department of Corrections ("DOC") to release any information required to be able to rent an apartment located in the city of Shoreline, Washington. (Dkt. #36, Exhibit 17). On January 22, 2002, plaintiff filed a grievance, stating that he had been informed that DOC policy 350.200 "was being applied" to him, and requesting that he be released to a pending felony detainer from the state of Oregon. (Dkt. #36, Exhibit 18, p. 1).

At the time plaintiff submitted this plan, DOC policy 350.200, Directive I.A.1.c.(2) (as approved by Defendant Lehman effective May 4, 2001) stated as follows:

> Staff will not refer the plan if the End of Sentence Review Committee has determined that the offender appears to meet the definition of a sexually violent predator and s/he has been referred for Civil Commitment under RCW 71.09.

(Dkt. #36, Exhibit 7, p. 2). The DOC responded to plaintiff's grievance, stating that his "referral for civil commitment" constituted a hold on his community placement referral pursuant to DOC policy 350.200. (Dkt. #36, Exhibit 18, pp. 2-3, 5-6).

On January 23, 2002, plaintiff submitted a community release referral ("CRR") requesting release in the city of Shoreline, Washington. (Dkt. #36, Exhibit 19). Plaintiff's proposed CRR was denied on February 1, 2002, apparently for the following reasons:

> A) RECEIVED E-MAIL FROM VICTORIA ROBERTS INDICATING THAT P. WILL BE EXTRADITED TO OREGON STATE, MULTNOMAH COUNTY ON 3-2-02 ON THEIR DETAINER.
>
> B) DENIED CRR [COMMUNITY RELEASE REFERRAL] FOR P. SINCE NO ADDRESS OR PLAN IS SUPPLIED. P. HAS NOT BROUGHT ANY RESOURCES OR CONTRIBUTION TO THE TRANSITION PROCESS, TRANSITION RESOURCES ARE LIMITED TO OFFENDERS WITHIN 90 DAYS OF THEIR MAX DATE.

(Dkt. #36, Exhibit 19, p. 3). On February 13, 2005, in response to an inmate kite, plaintiff again was told that pursuant to DOC policy 350.200 "no plan will be referred to field." (Dkt. #36, Exhibit 21).

On December 30, 2002, the Court of Appeals, Division I, decided <u>In re Dutcher</u>, 114 Wn. App.

755 (2002), regarding a personal restraint petition plaintiff had filed with that court. In that decision, the state court of appeals held that the DOC lacked authority to impose a policy which prevented an inmate from submitting a release plan, and which prevented its staff from investigating the proposed plan when the inmate has been referred for civil commitment. The policy addressed in Dutcher was the same policy in effect when the plaintiff submitted his proposed release plan, i.e., DOC policy 350.200.

Following the court of appeals' decision in In re Dutcher, on January 16, 2003, plaintiff submitted another CRR with the same proposed release address he provided in early January 2002. (Dkt. #34, Exhibit 6, p. 2). After investigating that proposed address, however, the DOC denied his release plan because it would put him in an unstable, high-risk situation. (Dkt. #34, Exhibit 6, pp. 2-3 and Attachment A). Plaintiff was informed of this denial on February 18, 2003. (Dkt. #34, Exhibit 6, p. 3). This was the last release plan that plaintiff submitted prior to his release from the DOC on September 12, 2003, two days before his maximum release date. (Dkt. #34, Exhibit 3, Attachment A, Dep. Transcript 24).

## DISCUSSION

A.  The standard of review.

The court may grant summary judgment "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with affidavits, if any, show that there is no genuine issue of material fact and that the moving party is entitled to judgment as a matter of law." Federal Rule of Civil Procedure ("Fed. R. Civ. P.") 56 (c). The moving party is entitled to judgment as a matter of law when the non-moving party fails to make a sufficient showing on an essential element of a claim on which the non-moving party has the burden of proof. Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1985).

There is no genuine issue of fact for trial where the record, taken as a whole, could not lead a rational trier of fact to find for the nonmoving party. Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 586 (1986)(nonmoving party must present specific, significant probative evidence, not simply "some metaphysical doubt."). *See also* Fed. R. Civ. P. 56 (e). Conversely, a genuine dispute over a material fact exists if there is sufficient evidence supporting the claimed factual dispute, requiring a judge or jury to resolve the differing versions of the truth. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 253 (1986); T. W. Elec. Service Inc. v. Pacific Electrical Contractors Association, 809 F.2d 626, 630 (9th Cir. 1987).

1  The determination of the existence of a material fact is often a close question. The court must
2  consider the substantive evidentiary burden that the non-moving party must meet at trial, e.g. the
3  preponderance of the evidence in most civil cases. Anderson, 477 U.S. at 254; T.W. Elec. Service Inc.,
4  809 F.2d at 630. The court must resolve any factual dispute or controversy in favor of the non-moving
5  party only when the facts specifically attested by the party contradicts facts specifically attested by the
6  moving party. Id.

7  The non-moving party may not merely state that it will discredit the moving party's evidence at
8  trial, in hopes that evidence can be developed at trial to support the claim. T.W. Elec. Service Inc., 809
9  F.2d at 630(relying on Anderson, *supra*). Conclusory, nonspecific statements in affidavits are not
10 sufficient, and "missing facts" will not be "presumed." Lujan v. National Wildlife Federation, 497 U.S.
11 871, 888-89 (1990).

    B.  The doctrine of qualified immunity.

13 Government officials are given qualified immunity from civil liability under § 1983 "insofar as their
14 conduct does not violate clearly established statutory or constitutional rights of which a reasonable person
15 would have known." Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982). In analyzing a qualified immunity
16 defense, the court must determine: (1) what right has been violated; (2) whether that right was so "clearly
17 established" at the time of the incident that a reasonable officer would have been aware of its
18 constitutionality; and (3) whether a reasonable public officer could have believed that the alleged conduct
19 was lawful. See Gabbert v. Conn, 131 F.3d 793, 799 (9th Cir.1997), overruled on other grounds, Conn v.
20 Gabbert, 526 U.S. 286 (1999); Newell v. Sauser, 79 F.3d 115, 117 (9th Cir.1996). The doctrine allows for
21 mistakes in judgement and a government official will not be held liable unless the unlawfulness of the action
22 should have been apparent. Act Up!/Portland v. Bagley, 988 F.2d. 868 (9th Cir. 1993).

    C.  Analysis.

24 The court begins by noting that an inmate has no constitutional right to release before expiration of
25 his or her sentence. Greenholtz v. Inmates of Nebraska, 442 U.S. 1 (1979). Nor have the Washington
26 State appellate courts recognized an independent state created interest in amassing early release credits. In
27 Re Galvez, 79 Wn. App 655 (1995). This does not, however, end the court's analysis. Under the facts of
28 this case, plaintiff had the possibility of release to a less restrictive setting subject to approval by the DOC

REPORT AND RECOMMENDATION
Page - 5

of a release plan.

The court is aware that the interest at issue in this case must be a state created liberty interest and is not an interest found under the Fourteenth Amendment Due Process Clause itself. Usually the court would first be required to determine whether there is in fact a state created liberty interest. The Washington State Court of Appeals, Division 1, found there to be a "limited liberty interest" in earned early release credit which requires minimal due process. In re Crowder, 97 Wn. App. 598 (1999). No hearing of any type was mandated by Crowder. Indeed, the court found that Crowder was afforded due process based on the attempts to find suitable community placement, even though his placement occurred 101 days after his earned early release date for community custody. Crowder, supra at p. 599.

In Dutcher, the same appellate court emphasized it was proceeding under RAP 16.4, which did not require a finding of a constitutional violation but rather only a finding of unlawful restraint under state law. Dutcher, supra at p. 758 (fn. 3 and 4, *citing* In re Cashaw, 123 Wn. 2d 138 (1994)).

The plaintiff in Cashaw filed a personal restraint petition ("PRP") which challenged the actions of the Indeterminate Sentence Review Board (the "Board") in setting his minimum prison term to coincide with the remainder of his court-imposed maximum sentence. The state court of appeals granted the "PRP after concluding the Board's failure to follow its own procedural rules violated Cashaw's due process rights." Cashaw, supra, at p. 140. While the Washington State Supreme Court affirmed the grant of the PRP, it did so on the ground that "an inmate may be entitled to relief solely upon showing the Board set a minimum term in violation of a statute or regulation." Cashaw at p. 140.

The state supreme court disagreed, however, with the court of appeals, and found "that no due process liberty interest was created here, for the Board's regulations imposed only procedural, not substantive, requirements." Cashaw at p. 140. The supreme court affirmed the notion that "procedural laws do not create liberty interests; only substantive laws can create these interests." Cashaw, supra at p. 145. Relief was granted in Cashaw by the supreme court under RAP 16.4 on the basis that the Board failed to follow its own regulations.

As noted above, the Washington State Supreme Court in Cashaw was careful to grant relief only on state grounds. Indeed, the state supreme court in Cashaw analyzed what is needed to find a state created liberty interest and found no due process violation in that case. The court stated:

REPORT AND RECOMMENDATION
Page - 6

> Liberty interests may arise from either of two sources, the due process clause and state laws. Hewitt v. Helms, 459 U.S. 460, 466, 103 S.Ct. 864, 868, 74 L.Ed.2d 675 (1983); Toussaint v. McCarthy, 801 F.2d 1080, 1089 (9th Cir.1986), cert. denied, 481 U.S. 1069, 107 S.Ct. 2462, 95 L.Ed.2d 871 (1987). The due process clause of the federal constitution does not, of its own force, create a liberty interest under the facts of this case for it is well settled that an inmate does not have a liberty interest in being released prior to serving the full maximum sentence. Greenholtz v. Inmates of Nebraska Penal & Correctional Complex, 442 U.S. 1, 7, 99 S.Ct. 2100, 2103, 60 L.Ed.2d 668 (1979); Ayers, 105 Wash.2d at 164-66, 713 P.2d 88; Powell, 117 Wash.2d at 202-03, 814 P.2d 635.
>
> However, as indicated above, state statutes or regulations can create due process liberty interests where none would have otherwise existed. See Hewitt, 459 U.S. at 469, 103 S.Ct. at 870; Toussaint, 801 F.2d at 1089; Powell, 117 Wash.2d at 202-03, 814 P.2d 635. By enacting a law that places substantive limits on official decisionmaking, the State can create an expectation that the law will be followed, and this expectation can rise to the level of a protected liberty interest. See Toussaint, 801 F.2d at 1094.
>
> For a state law to create a liberty interest, it must contain "substantive predicates" to the exercise of discretion and "**specific directives to the decisionmaker that if the regulations' substantive predicates are present, a particular outcome must follow**". Kentucky Dep't of Corrections v. Thompson, 490 U.S. 454, 463, 109 S.Ct. 1904, 1910, 104 L.Ed.2d 506 (1989); Swenson v. Trickey, 995 F.2d 132, 134 (8th Cir.), cert. denied, 510 U.S. 999, 114 S.Ct. 568, 126 L.Ed.2d 468 (1993). **Thus, laws that dictate particular decisions given particular facts can create liberty interests, but laws granting a significant degree of discretion cannot.**

In Re Cashaw, 123 Wn 2d at 144 (emphasis added).

The DOC has been mandated by statute to implement a system that allows for the possibility of early release. For some inmates their release is automatic when they reach their earned early release date because they have no supervision following incarceration. Inmates like the plaintiff, who were sentenced to community placement or community custody, cannot earn this reduction in sentence. Instead, they earn a possibility of being placed on community placement or community custody at the discretion of the DOC. Their release is not automatic.

RCW 9.94A.728(2)(d) grants the DOC the ability and the discretion to deny a release plan for any person who would receive community custody, if the DOC determines the plan may violate conditions of a sentence or supervision, may place the offender at risk to re-offend, or presents a risk to the victim or community safety. Whatever limits have been placed on the DOC, therefore, are not outcome determinative, and under the analysis used in Cashaw there would be no state created liberty interest. By way of example, the discretion of the DOC has not been limited when the DOC considers how close to a school or day care an offender may reside. The DOC still has a significant degree of discretion in granting or denying release to community placement or community custody. The statute itself states the DOC's

"authority under this section is independent of any court-ordered condition of sentence or statutory provision regarding conditions for community custody or community placement." RCW 9.94A.728 (2)(d).

In <u>Dutcher</u>, the Washington State Court of Appeals proceeded pursuant to RAP 16.4 (Personal Restraint Petition - Grounds for Remedy). The court of appeals used a standard of review which did not require the finding of a constitutional violation. The ruling in <u>Dutcher</u> that the DOC must follow the state statutory system and consider plans on the merits does not equate to a finding of a state created liberty interest in release, and the holding in <u>Dutcher</u> did not eliminate the DOC's discretion.

In addition, <u>Dutcher</u> was not decided until December 2002, some eleven months after plaintiff's first release plan was denied. As noted above, furthermore, plaintiff's second release plan was denied for legitimate reasons. That is, it was denied because it placed him in a unstable, high risk situation. (Dkt. #34, Exhibit 6, pp. 2-3). More specifically, plaintiff requested to be released to an address located in an area known for its illegal activity, where he planned to live with another sex offender, who was known to be "extremely anti-social and drug-oriented" and who intended to leave the country "every few weeks" presumably in order to commit sex offenses and use narcotics, according to the investigating community corrections officer. (Dkt. #34, Exhibit 7, pp. 2-3).

In 1995, the United States Supreme Court examined the methodology used to determine if state laws or regulations created liberty interests in a prison context and the Supreme Court adopted a new approach. <u>Sandin v. Conners</u>, 515 U.S. 472 (1995). As plaintiff notes, the Supreme Court stated that "[t]hese interests will be generally limited to freedom from restraint which impose atypical and significant hardship on the inmate in relation to the ordinary incidents of prison life." (Dkt. # 36, p. 12). The decision in <u>Sandin</u> was a reaction to the practice of combing state regulations for mandatory language to find liberty interests.

It is settled that an inmate has no constitutional right to release before expiration of the court imposed sentence. <u>Greenholtz v. Inmates of Nebraska</u>, 442 U.S. 1 (1979). Therefore, the refusal to investigate a proposed plan does not lead to violation of a constitutionally protected right. There is no change in the incidents of normal prison life and the inmate is held until the expiration of his sentence. When the court considers that at the time of sentencing plaintiff was not allowed the possibility of having any unconditional release, this result is not overly harsh. An inmate has no constitutional right to parole or

REPORT AND RECOMMENDATION
Page - 8

to any type of automatic release to community custody.

Plaintiff's citation to cases where the inmates had the ability to truly earn early release and shorten their sentence is of no help or guidance to the court. Cases such as Wolf v McDonnell, 418 U.S. 539 (1974), and In Re Anderson, 112 Wn. 2nd. 546 (1989) deal with a liberty interest in release that plaintiff never possessed. The statute governing plaintiff's sentencing precluded him from earning early release. The court today does not find a state created liberty interest in having a release plan considered.

D.   Qualified Immunity.

Plaintiff submitted only one proposed release plan prior to the Washington State Court of Appeals' decision in Dutcher, and that plan was denied in early February, 2002. Under the doctrine of qualified immunity, officials are "shielded from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." Harlow v. fitzgerald, 457 U.s. 800, 818 (1982). Although this court has concluded that there was no constitutional violation, the issue of qualified immunity will also be addressed here. Therefore, the court must determine whether the law governing defendant's conduct was clearly established at the time plaintiff's first release plan was denied. This court finds that it was not and that defendant is entitled to qualified immunity.

The case relied upon by plaintiff, In re Dutcher, was not decided until December 30, 2002, some eleven months after the his first release plan was denied. Prior to the state court of appeals' decision in Dutcher, the law was not clearly established that the portion of DOC Policy 350.200 which prevented consideration of release plans was invalid. In addition, as discussed above, although plaintiff did submit a second release plan soon after In re Dutcher was decided, the DOC promptly investigated that plan and denied it for purely legitimate reasons. Accordingly, defendant's motion for summary judgment should be **GRANTED** and plaintiff's motion for partial summary judgment should be **DENIED**.

## CONCLUSION

For the reasons stated above the court should **GRANT** defendant's motion for summary judgment (Dkt. #34) and should **DENY** plaintiff's motion for partial summary judgment (Dkt. #35).

Pursuant to 28 U.S.C. § 636(b)(1) and Fed. R. Civ. P. 72(b), the parties shall have ten (10) days from service of this Report to file written objections. See also Fed. R. Civ. P. 6. Failure to file objections

will result in a waiver of those objections for purposes of appeal. <u>Thomas v. Arn</u>, 474 U.S. 140 (1985). Accommodating the time limit imposed by Fed. R. Civ. P. 72(b), the clerk is directed to set the matter for consideration on October 28, 2005, as noted in the caption.

DATED this 4th day of October, 2005.

Karen L. Strombom
United States Magistrate Judge

REPORT AND RECOMMENDATION
Page - 10